IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PAUL S. ROTELLA, ESQUIRE, and : No. 3:20cv966
BONNIE ROTELLA, his wife, :
       Plaintiffs : (Judge Munley)
:
v. :
:
STATE FARM FIRE AND CASUALTY :
COMPANY, :
       Defendant :
............................................................................................

## MEMORANDUM

Before the court is a motion for summary judgment (Doc. 23) filed by Defendant State Farm Fire and Casualty Company in this declaratory judgment action, which is fully briefed and ripe for disposition.[1]

## Background[2]

This matter arises out of a disputed water damage claim on a homeowners insurance policy. After taking a shower on July 16, 2019, Plaintiff Bonnie Rotella observed a stain on the living room ceiling directly below the master bathroom and suspected a water leak. (Doc. 25-2, Dep. of B. Rotella, at 29:4-13).

---

[1] The Honorable Robert D. Mariani transferred this case to the undersigned on November 7, 2023.

[2] Citations to the record are provided only where plaintiff disputes defendant's statement of material facts or the parties argue the record is subject to differing interpretations or characterizations. All facts are construed in a light most favorable to plaintiff as the nonmoving party. See Daniels v. Sch. Dist. of Philadelphia, 776 F.3d 181, 187 (3d Cir. 2015)(citation omitted).

Subsequently, Ms. Rotella notified a contractor, Brian Goodwin, who later inspected the areas of concern.[3]  Goodwin removed a speaker in the living room ceiling to inspect the area near the water stain.  At that time, Goodman assumed that the discoloration revealed mold, per his testimony. (Doc. 25-4 at 25:1-13).  Ms. Rotella submitted a claim to defendant shortly thereafter.  In an e-mail to defendant's representative dated July 24, 2019, she attached photographs demonstrating what she believed to be "beam damage mold[.]" (Doc. 25-5).  Later, however, Ms. Rotella indicated that testing of the area for mold came back negative.  (Doc. 25-2 at 62:15-63:1, Doc. 2, Complaint, Exh. C).

Defendant's adjuster visited the property on July 29, 2019 to inspect the shower and living room.  (Doc. 25-2 at 43:20-23, 48:16-23).  According to Ms. Rotella, the adjuster did not climb a ladder to investigate the living room ceiling. (Id. at 48:19-49-2).  Rather, the adjuster focused on the drain of the shower and advised plaintiff that the source of the leak came from this area. (Id.)  By letter dated that same day, the adjuster denied plaintiffs' claim under several policy exclusions.  (Doc. 25-7).

---

[3] The parties refer to Goodwin as a handyman.  Goodwin, however, testified that he is the sole proprietor of a residential renovation and remodeling business. (Doc. 25-4 at 8:16-24). Per Goodwin, 75% of his business involves renovating bathrooms. (Id. at 16:14-17).  He indicated that he performed different types of jobs for Ms. Rotella for several years, including maintenance and upkeep of her home. (Id. at 19:7-13, 20:3-22).

2

Subsequently, another contractor took down a section of the living room ceiling and Goodwin returned to the property to complete repairs. Goodwin removed the materials on the walls and floor of the shower and discovered that the PEX[4] supply line to the handheld showerhead had ruptured. According to Goodwin, the supply line would only leak when using the handheld showerhead. Goodwin also indicated that he observed staining on the drywall behind the travertine material used in the shower area. As discussed in more detail below, defendant relies on Goodwin's testimony in support of summary judgment regarding the policy exclusions.

Defendant's representative issued correspondence to plaintiffs dated December 17, 2019 that the policy "does not provide coverage for this loss as our investigation has determined that the loss was a result of a long term leak and not a sudden accidental burst of water." (Doc. 2, Complaint, Exh. B).

After defendant denied coverage, plaintiffs filed their complaint in the Pike County Court of Common Pleas on May 4, 2020. (Doc. 2). Defendant then removed the matter on June 15, 2020. (Doc. 1).

---

[4] PEX is an abbreviation for polyethylene cross-linked plastic.

Initially, plaintiffs pursued two causes of action, one for declaratory judgment and one for bad faith.[5] (Doc. 2). The parties subsequently stipulated to the dismissal of plaintiffs' bad faith claim without prejudice. (Doc. 12). In their remaining claim, plaintiffs seek a declaration that the defendant maintains a duty to provide coverage and a duty to pay damages incurred by plaintiffs in the amount of $41,421.79.

Defendant filed an answer on January 13, 2021, raising affirmative defenses, including several policy exclusions. (Doc. 19). After a period of discovery, defendant filed the instant motion for summary judgment, (Doc. 23), which is ripe for disposition.

**Jurisdiction**

The court has jurisdiction pursuant to the diversity statute, 28 U.S.C. § 1332. Plaintiffs are citizens of Pennsylvania. (Doc. 2, Complaint, ¶ 1). Defendant is incorporated under the laws of the State of Illinois with its principal place of business in Illinois. (Doc. 1, Notice of Removal, ¶ 13). Additionally, the amount in controversy exceeded $75,000 at the time this matter was commenced.[6] Because complete diversity of citizenship exists among the parties

---

[5] Plaintiffs did not bring a cause of action for breach of contract. "[T]he fact that another remedy would be equally effective affords no ground for declining declaratory relief." FED. R. CIV. P. 57, 1937 Advisory Committee Notes.

[6] Plaintiffs' complaint initially included a claim for bad faith with a request for punitive damages that the parties later dismissed without prejudice by stipulation. Where an appropriate claim

4

and the amount in controversy exceeded $75,000 at the commencement of the action, the court has jurisdiction over this case. See 28 U.S.C. § 1332 ("district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different states[.]"); 28 U.S.C. § 1441 (A defendant can generally move a state court civil action to federal court if the federal court would have had original jurisdiction to address the matter pursuant to the diversity jurisdiction statute). As a federal court sitting in diversity, the substantive law of Pennsylvania shall apply to the instant case. Chamberlain v. Giampapa, 210 F.3d 154, 158 (3d Cir. 2000) (citing Erie R.R. v. Tomkins, 304 U.S. 64, 78 (1938)).[7]

---

for punitive damages is made, the amount in controversy requirement is generally met "because it cannot be stated to a legal certainty that the value of the plaintiff's claim is below the statutory minimum." Huber v. Taylor, 532 F.3d 237, 244 (3d Cir. 2008) (internal citation, emphasis, and quotation marks omitted).

As for the current amount in controversy, "the inability of a plaintiff to ultimately recover an amount adequate to give the court jurisdiction" does not "oust the court's subject matter jurisdiction." Id. at 243 (citing St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 289 (1938)); see also Rosado v. Wyman, 397 U.S. 397, 405 n. 6 (1970)(noting that a federal court does not lose jurisdiction over a diversity action which was well founded at the outset even though the amount recoverable falls short of the statutory minimum). No party asserts any "subsequent revelations" that the required statutory amount was not in controversy at the commencement of the action. See Huber, 532 F.3d at 244.

[7] Because federal procedural law applies in diversity cases and the Supreme Court has characterized the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201-2202, as procedural, the DJA supplies the procedural law that governs this declaratory judgment action even though plaintiffs initially requested relief under Pennsylvania's Declaratory Judgments Act. Kelly v. Maxum Specialty Ins. Grp., 868 F.3d 274, 281, n. 4 (3d Cir. 2017).

5

**Legal Standard**

Granting summary judgment is proper " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " See Knabe v. Boury Corp., 114 F.3d 407, 410 n. 4 (3d Cir.1997) (quoting FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir.1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. Anderson, 477 U.S. at 248 (1986). A fact is material when it might affect the outcome of the suit under the governing law. Id. Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to

admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. Id. at 324.

**Analysis**

    **1. Policy Terms**

At the time of the water leak, defendants insured plaintiffs' residence under the terms of an insurance policy.[8] (Doc. 25-3). Under Pennsylvania law, insurance policies are interpreted using contract principles, "as, at base, an insurance policy is nothing more than a contract between an insurer and an insured." Gallagher v. GEICO Indem. Co., 201 A.3d 131, 137 (Pa. 2019)(citation omitted). If policy terms are clear and unambiguous, then those terms are given their plain and ordinary meaning, unless those terms violate a clearly established public policy. Kurach v. Truck Ins. Exch., 235 A.3d 1106, 1116 (2020)(citation omitted). Where terms are ambiguous, or "subject to more than one reasonable interpretation when applied to a particular set of facts[,]" the policy provision is to

---

[8] Specifically, defendants issued policy 78-ER-A896-4, effective May 19, 2019 to May 19, 2020 ("the policy"). (Doc. 25-3). Plaintiff Bonnie Rotella is the only listed named insured. (Id.)

be construed "in favor of the policyholder and against the insurer, as the insurer drafted the policy and selected the language which was used therein." Id. (citations omitted and quotation marks removed). Bearing these standards in mind, the court will discuss the policy language at issue here.

The policy covered plaintiffs' "dwelling," defined by the policy in relevant part as "the building structure on the residence premises used as the primary private residence..." (Doc. 25-3, State Farm Homeowners Policy Pennsylvania HW-2138, Definitions, p. 2). Under its terms, insurance for the dwelling is referred to in the policy as Coverage A. (Id. at p. 5). The policy provides that defendant "will pay for accidental direct physical loss to the property described in Coverage A unless the loss is excluded or limited in SECTION I – LOSSES NOT INSURED or otherwise excluded or limited in this policy." (Id., Section I - Losses Insured, p. 12).

"Section I – Losses Not Insured" contains three paragraphs with itemized policy exclusions. In Paragraph 1 of this section, the policy indicates that defendant "will not pay for any loss to the property…that consists of, or is directly and immediately caused by, one or more" of certain enumerated and defined perils listed in this policy section, "regardless of whether the loss occurs abruptly or gradually…or occurs as a result of any combination of these[.]"(Id., Section I – Losses Not Insured, ¶ 1, p. 14).

8

One of the itemized exclusions in Paragraph 1 of the policy reads as follows:

> f. seepage or leakage of water, steam, or sewage that occurs or develops over a period of time: (1) and is: (a) continuous; (b) repeating; (c) gradual; (d) intermittent; (e) slow; or (f) trickling; and (2) from a: (a) heating, air conditioning, or automatic fire protective sprinkler system; (b) household appliance; or (c) plumbing system, including from, within or around any shower stall, shower bath, tub installation, or other plumbing fixture, including their walls, ceilings, or floors.
>
> We also will not pay for losses arising from condensation or the presence of humidity, moisture, or vapor that occurs or develops over a period of time;

(Id. ¶ 1f, p. 14-15)(formatting modified).

Several other itemized perils are listed in Paragraph 1 of this section as excluding coverage for:

> g. wear, tear, decay, marring, scratching, deterioration, inherent vice, latent defect, or mechanical breakdown;
>
> h. corrosion, electrolysis, or rust;
>
> i. wet or dry rot; ...
>
> k. settling, cracking, shrinking, bulging, or expansion of pavements, patios, foundations (including slabs, basement walls, crawl space walls, and footings), walls, floors, roofs, or ceilings;

(Id. at ¶ 1g-i, k, p. 15-16).

Following the description of these enumerated and defined perils, the policy indicates, "[h]owever, we will pay for any resulting loss from [the relevant perils described above] unless the resulting loss is itself a Loss Not Insured as described in this Section." (Id. at p. 16).

Paragraph 2 of this section for losses not insured also includes a fungus exclusion. (Id. at ¶ 2g, p. 16-17). "[F]ungus" is defined under the policy as "any type or form of fungus, including mold, mildew, mycotoxins, spores, scents, or by-products produced or released by fungi." (Id., Definitions, p. 2). Specifically, the policy provides that the defendant:

> will not pay for, under any part of this policy, any loss that would not have occurred in the absence of one or more of the following excluded events. We will not pay for such loss regardless of: (a) the cause of the excluded event; or (b) other causes of the loss; or (c) whether other causes acted concurrently or in any sequence with the excluded event to produce the loss; or (d) whether the event occurs abruptly or gradually, involves isolated or widespread damage, occurs on or off the residence premises, arises from any natural or external forces, or occurs as a result of any combination of these: . . .
>
> g. Fungus, including:
>
> (1) any loss of use or delay in rebuilding, repairing, or replacing covered property, including any associated cost or expense, due to interference at the residence premises or location of the rebuilding, repair, or replacement, by fungus;
>
> (2) any remediation of fungus, including the cost to: (a) remove the fungus from covered property or to repair,

> restore, or replace that property; or (b) tear out and replace any part of the building structure or other property as needed to gain access to the fungus; or
>
> (3) the cost of any testing or monitoring of air or property to confirm the type, absence, presence, or level of fungus, whether performed prior to, during, or after removal, repair, restoration, or replacement of covered property.

(Id., Section I – Losses Not Insured at ¶ 2g, p. 16-17)(formatting modified).

In addition to the exclusions listed in Paragraphs 1 and 2 of this policy section, defendant relies on another exclusion in Paragraph 3, which provides:

> We will not pay for, under any part of this policy, any loss consisting of one or more of the items below.
>
> Further, we will not pay for any loss described in paragraphs 1. and 2. immediately above regardless of whether one or more of the following: (a) directly or indirectly cause, contribute to, or aggravate the loss; or (b) occur before, at the same time, or after the loss or any other cause of the loss: . . .
>
> b. defect, weakness, inadequacy, fault, or unsoundness in:
>
> (1) planning, zoning, development, surveying, or siting; (2) design, specifications, workmanship, repair, construction, renovation, remodeling, grading, or compaction; (3) materials used in repair, construction, renovation, remodeling, grading, or compaction; or (4) maintenance; of any property (including land, structures, or improvements of any kind) whether on or off the residence premises;

(Id., at ¶ 3b, p. 18)(formatting modified).

11

Defendant raised the above policy exclusions in their answer as affirmative defenses. (Doc. 19). Having recited these policy sections, the court turns next to defendant's arguments that summary judgment is warranted on these defenses.

## 2. Defendant's Arguments

Defendant argues that the record in this case places plaintiffs' loss squarely within the above policy exclusions and thus summary judgment must be granted. (Doc. 26 at p. 6). Relying on the language cited by their representative in denying the claim, that "the loss was the result of a long term leak and not a sudden accidental burst of water[,]" (See Doc. 2, Complaint, Exh. B), defendant also argues that Goodwin's testimony as the plaintiffs' contractor confirms that the damage resulted from a leak occurring over time. (Doc. 26 at 6). However, after reviewing the record in a light most favorable to plaintiffs, the court disagrees that summary judgment is appropriate here.

In a declaratory judgment action to determine whether a claim is covered, the court's role is "to resolve the question of coverage to eliminate uncertainty." Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc., 606 Pa. 584, 611 (2010)(citation omitted). Under Pennsylvania law, it is a necessary prerequisite for an insured to demonstrate a claim is within the coverage provided by the policy and then the burden shifts to the insurer to establish any exclusion as an affirmative defense. Nationwide Mut. Ins. Co. v. Cosenza, 258 F.3d 197, 206 (3d Cir. 2001)(applying

Pennsylvania law); Erie Ins. Exch. v. Transamerica Ins. Co., 533 A.2d 1363, 1366 (Pa. 1987); Butterfield v. Giuntoli, 670 A.2d 646, 652 (Pa. Super. Ct. 1995)(citations omitted).

Regardless of the parties' various burdens in this case and at the summary judgment stage, plaintiffs counter summary judgment with references to the record where Goodwin's testimony, along with other evidence, supports "accidental direct physical loss to the property" as covered by the policy.

For example, Goodwin drafted a letter indicating that the PEX supply line to the handheld showerhead had ruptured and that he removed the shower base and found no leak in that area. (Doc. 27-1). In the letter, Goodwin explained that the shower system used a "pressurized closed system" so when a person specifically turned on that showerhead, "water flooded down the shower wall into the ceiling of the living room." (Id.) In his deposition, Goodwin clarified that water flowed to the handheld showerhead only when selected for use and would not leak otherwise. (Doc. 25-4 at 44:8-45:9). Per Goodwin, when he activated the handheld shower after demolition, water sprayed from the supply line, which he described as not "exactly a pinhole, but [not] a geyser." (Id. at 47:8-14).

In support of their arguments, defendant pinpoints one section of Goodwin's deposition where he reviewed photographs showing the underside of the bathroom subfloor after the removal of a portion of the living room ceiling. (Id.

at 31:16-19). Reviewing one photograph, Goodwin testified that the water leak would have been from a repeated event because a one-time occurrence would not leave a black stain as depicted in the photograph. (Id. at 34:5-20). However, contrary to defendant's arguments, Goodwin could not state the length of time of the leak. (Id. at 34:14-16). Further, he testified as follows:

> Q. Okay. So it looks like the areas closer to the drain are darker, correct?
>
> A. Yes.
>
> Q. And then as you go further out, it's – it becomes, for lack of a better term, less dark?
>
> A. Yes.
>
> Q. Okay. Would that also support the fact that this is likely not a one time occurrence?
>
> A. It would support it. **But that's not necessarily exactly what would cause it.**

(Id. at 34:25-9 (emphasis added)).

Additionally, Goodwin's testimony about the condition of the floorboards under the shower is not so definitive as to warrant summary judgment based on the policy exclusions. When he replaced the floorboards as part of the repair, Goodwin did so according to his testimony "because [he] didn't like the way it looked[,]" and would not put his "new work on top of something that [he did not] like." (Id. at 50:3-13). He further testified:

14

> Q. And were you concerned about rot in the floor boards?
>
> A. Well, when something's black, even though they say that there's no mold there, I build something so I don't get called back. So if I don't like it, I don't put it on there. I replace it.

(Id. at 50:14-19).

Additionally, according to Goodwin, he initially included repair or replacement of a joist under the shower area in his estimate to Ms. Rotella. (Id. at 37:20-38:1). As Goodwin explained, the joist was manufactured from chipped wood, and not a piece of dimensional lumber. (Id. at 38:11-24). He included replacement of the joist in his estimate in the event that the wood turned black from rot. (Id. at 37:20-39:6). Per Goodwin, however, he did not have to replace that floor joist. (Id. at 50:20-22). Rather, Goodwin included work on the joist in the estimate to "cover all bases[.]" (Id. at 38:2-10). It follows that the joist was not black from rot, but black from staining, according to Goodwin's assessment of the damage. (Id. at 38:25-39:6). Goodwin's testimony about the state of wooden materials under the shower thus can be considered in support of both parties' positions.

Addressing the fungus exclusion next, when Goodwin recounted his initial inspection of the leak through the speaker hole in the living room ceiling, he testified that he could see black discoloration on the subfloor. (Doc. 25-4 at 25:7-

9). However, Goodwin did not state categorically that the black discoloration indicated the presence of mold. He testified:

> Q. Did you see any mold?
>
> A. I was assuming, at that time, it was mold. But, you know, that's assuming right now, looking up. You know water does discolor and turn wood black also... So whether it's mold or not, I didn't know it at that time. But I did write it down as mold.

(Id. at 25:10-18).

A reasonable factfinder could consider Goodwin's testimony and observations in different ways. Moreover, Goodwin's testimony does not appear in a vacuum. Goodwin authored two letters in this matter, one prior to conducting repairs, (Doc. 27-3), and one during or after repairs, (Doc. 27-1). To the extent that Goodwin's testimony is inconsistent with these letters, Goodwin's credibility will have to be weighed. Furthermore, a factfinder will have to weigh Goodwin's testimony along with Plaintiff Bonnie Rotella's testimony and consider the other evidence to resolve this coverage dispute. For example, Ms. Rotella testified that she used the shower daily and the water stain did not appear until the alleged date of loss. (Doc. 25-2, 69:10-70:1). She also indicated that she observed no evidence of rot in the subfloor around the shower after materials were removed. (Id. at 78:20-79:10). Additionally, four different mold tests in the area of the leak

16

came back negative, per Ms. Rotella. (Id. at 62:15-63:1, Doc. 2, Complaint, Exh. C).

Accordingly, Plaintiff has identified material factual issues in dispute. Coupled with the need to weigh evidence and testimony to resolve questions regarding coverage, these disputed factual issues preclude summary judgment.

**Conclusion**

For the reasons set forth above, defendant's motion for summary judgment (Doc. 23) will be denied. An appropriate order follows.

Date: 2/20/24

_____
**JUDGE JULIA K. MUNLEY**
**United States District Court**